*773 Justice Stevens,
with whom Justice Ginsburg joins,
dissenting.
The issue presented to us is much narrower than is suggested by the far-ranging arguments of the parties and their amici. Neither the tragic facts of the case, nor the importance of according proper deference to law enforcement professionals, should divert our attention from that issue. That issue is whether the restraining order entered by the Colorado trial court on June 4,1999, created a “property” interest that is protected from arbitrary deprivation by the Due Process Clause of the Fourteenth Amendment.
It is perfectly clear, on the one hand, that neither the Federal Constitution itself, nor any federal statute, granted respondent or her children any individual entitlement to police protection. See DeShaney v. Winnebago County Dept. of Social Servs., 489 U. S. 189 (1989). Nor, I assume, does any Colorado statute create any such entitlement for the ordinary citizen. On the other hand, it is equally clear that federal law imposes no impediment to the creation of such an entitlement by Colorado law. Respondent certainly could have entered into a contract with a private security firm, obligating the firm to provide protection to respondent’s family; respondent’s interest in such a contract would unquestionably constitute “property” within the meaning of the Due Process Clause. If a Colorado statute enacted for her benefit, or a valid order entered by a Colorado judge, created the functional equivalent of such a private contract by granting respondent an entitlement to mandatory individual protection by the local police force, that state-created right would also qualify as “property” entitled to constitutional protection.
I do not understand the majority to rule out the foregoing propositions, although it does express doubts. See ante, at ‘ 766 (“[I]t is by no means clear that an individual entitlement to enforcement of a restraining order could constitute a *774 ‘property5 interest”). Moreover, the majority does not contest, see ante, at 768, that if respondent did have a cognizable property interest in this ease, the deprivation of that interest violated due process. As the Court notes, respondent has alleged that she presented the police with a copy of the restraining order issued by the Colorado court and requested that it be enforced. Ante, at 751, n. 1. In response, she contends, the officers effectively ignored her. If these allegations are true, a federal statute, Rev. Stat. §1979, 42 U. S. C. § 1983, provides her with a remedy against the petitioner, even if Colorado law does not. See Cleveland Bd. of Ed. v. Loudermill, 470 U. S. 532 (1985).
The central question in this case is therefore whether, as a matter of Colorado law, respondent had a right to police assistance comparable to the right she would have possessed to any other service the government or a private firm might have undertaken to provide. See Board of Regents of State Colleges v. Roth, 408 U. S. 564, 577 (1972) (“Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent souree such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits”).
There was a time when our tradition of judicial restraint would have led this Court to defer to the judgment of more qualified tribunals in seeking the correct answer to that difficult question of Colorado law. Unfortunately, although the majority properly identifies the “central state-law question” in this case as “whether Colorado law gave respondent a right to police enforcement of the restraining order,” ante, at 758, it has chosen to ignore our settled practice by providing its own answer to that question. Before identifying the flaws in the Court’s ruling on the merits, I shall briefly comment on our past practice.
*775 I
The majority’s decision to plunge ahead with its own analysis of Colorado law imprudently departs from this Court’s longstanding policy of paying “deference [to] the views of a federal court as to the law of a State within its jurisdiction.” Phillips v. Washington Legal Foundation, 524 U. S. 156, 167 (1998); see also Bishop v. Wood, 426 U. S. 341, 346, and n. 10 (1976) (collecting cases). This policy is not only efficient, but it reflects “our belief that district courts and courts of appeals are better schooled in and more able to interpret the laws of their respective States.” Brockett v. Spokane Arcades, Inc., 472 U. S. 491, 500-501 (1985); Hillsborough v. Cromwell, 326 U. S. 620, 629-630 (1946) (endorsing “great deference to the views of the judges of those courts ‘who are familiar with the intricacies and trends of local law and practice’”). Accordingly, we have declined to show deference only in rare eases in which the court of appeals’ resolution of state law was “clearly wrong” or otherwise seriously deficient. See Brockett, 472 U. S., at 500, n. 9; accord, Leavitt v. Jane L., 518 U. S. 137, 145 (1996) (per curiam).
Unfortunately, the Court does not even attempt to demonstrate that the six-judge en banc majority was “clearly wrong” in its interpretation of Colorado’s domestic restraining order statute; nor could such a showing be made. For it is certainly plausible to construe “shall use every reasonable means to enforce a restraining order” and “shall arrest,” Colo. Rev. Stat. §§ 18-6-803.5(3)(a)-(b) (Lexis 1999) (emphasis added), as conveying mandatory directives to the police, particularly when the same statute, at other times, tellingly employs different language that suggests police discretion, see § 18-6-803.5(6)(a) (“A peace officer is authorized to use every reasonable means to protect... ”; “Such peace officer may transport ...” (emphasis added)).[1] Moreover, unlike *776 today’s decision, the Court of Appeals was attentive to the legislative history of the statute, focusing on a statement by the statute’s sponsor in the Colorado House, ante, at 759, n. 6 (quoting statement), which it took to “emphasiz[e] the importance of the police’s mandatory enforcement of domestic restraining orders.” 366 F. 3d 1093, 1107 (CA10 2004) (en banc). Far from overlooking the traditional presumption of police discretion, then, the Court of Appeals’ diligent analysis of the statute’s text, purpose, and history led it to conclude that the Colorado Legislature intended precisely to abrogate that presumption in the specific context of domestic restraining orders. That conclusion is eminently reasonable and, I believe, worthy of our deference.[2]
r — i
Even if the Court had good reason to doubt the Court of Appeals’ determination of state law, it would, in my judgment, be a far wiser course to certify the question to the *777 Colorado Supreme Court.[3] Powerful considerations support certification in this case. First, principles of federalism and comity favor giving a State’s high court the opportunity to answer important questions of state law, particularly when those questions implicate uniquely local matters such as law enforcement and might well require the weighing of policy considerations for their correct resolution.[4] See Elkins v. Moreno, 435 U. S. 647, 662, n. 16 (1978) (sua sponte certifying a question of state law because it is “one in which state governments have the highest interest”); cf. Arizonans for Official English v. Arizona, 520 U. S. 43, 77 (1997) (“Through certification of novel or unsettled questions of state law for authoritative answers by a State’s highest court, a federal court may save ‘time, energy, and resources, and hel[p] build a cooperative judicial federalism’” (brackets in original)).[6] *778 Second, by certifying a potentially dispositive state-law issue, the Court would adhere to its wise policy of avoiding the unnecessary adjudication of difficult questions of constitutional law. See Elkins, 435 U. S., at 661-662 (citing constitutional avoidance as a factor supporting certification). Third, certification would promote both judicial economy and fairness to the parties. After all, the Colorado Supreme Court is the ultimate authority on the meaning of Colorado law, and if in later litigation it should disagree with this Court’s provisional state-law holding, our efforts will have been wasted and respondent will have been deprived of the opportunity to have her claims heard under the authoritative view of Colorado law. The unique facts of this case only serve to emphasize the importance of employing a procedure that will provide the correct answer to the central question of state law. See Brockett, 472 U. S., at 510 (O’Connor, J., concurring) (“Speculation by a federal court about the meaning of a state statute in the absence of a prior state court adjudication is particularly gratuitous when, as is the case here, the state courts stand willing to address questions of state law on certification from a federal court”).[6]
*779 I — I HH 1 — I
Three flaws in the Court’s rather superficial analysis of the merits highlight the unwisdom of its decision to answer the state-law question de novo. First, the Court places undue weight on the various statutes throughout the country that seemingly mandate police enforcement but are generally understood to preserve police discretion. As a result, the Court gives short shrift to the unique case of “mandatory arrest” statutes in the domestic violence context; States passed a wave of these statutes in the 1980’s and 1990’s with the unmistakable goal of eliminating police discretion in this area. Second, the Court’s formalistic analysis fails to take seriously the fact that the Colorado statute at issue in this case was enacted for the benefit of the narrow class of persons who are beneficiaries of domestic restraining orders, and that the order at issue in this case was specifically intended to provide protection to respondent and her children. Finally, the Court is simply wrong to assert that a citizen’s interest in the government’s commitment to provide police enforcement in certain defined circumstances does not resemble any “traditional conception of property,” ante, at 766; in fact, a citizen’s property interest in such a commitment is just as concrete and worthy of protection as her interest in any other important service the government or a private firm has undertaken to provide.
In 1994, the Colorado General Assembly passed omnibus legislation targeting domestic violence. The part of the legislation at issue in this case mandates enforcement of a domestic restraining order upon probable cause of a violation, § 18-6-803.5(3), while another part directs that police officers “shall, without undue delay, arrest” a suspect upon “probable cause to believe that a crime or offense of domestic violence *780 has been committed,” § 18-6-803.6(l).[7] In adopting this legislation, the Colorado General Assembly joined a nationwide movement of States that took aim at the crisis of police un-derenforcement in the domestic violence sphere by implementing “mandatory arrest” statutes. The crisis of under-enforcement had various causes, not least of which was the perception by police departments and police officers that domestic violence was a private, “family” matter and that arrest was to be used as a last resort. Sack, Battered Women and the State: The Struggle for the Future of Domestic Violence Policy, 2004 Wis. L. Rev. 1657, 1662-1663 (hereinafter Sack); id., at 1663 (“Because these cases were considered noncriminal, police assigned domestic violence calls low priority and often did not respond to them for several hours or ignored them altogether”). In response to these realities, and emboldened by a well-known 1984 experiment by the Minneapolis police department,[8] “many states enacted man *781 datory arrest statutes under which a police officer must arrest an abuser when the officer has probable cause to believe that a domestic assault has occurred or that a protection order has been violated.” Developments in the Law: Legal Responses to Domestic Violence, 106 Harv. L. Rev. 1498,1537 (1993). The purpose of these statutes was precisely to “counter police resistance to arrests in domestic violence cases by removing or restricting police officer discretion; mandatory arrest policies would increase police response and reduce batterer recidivism.” Sack 1670.
Thus, when Colorado passed its statute in 1994, it joined the ranks of 15 States that mandated arrest for domestic violence offenses and 19 States that mandated arrest for domestic restraining order violations. See Developments in the Law, 106 Harv. L. Rev., at 1537, n. 68 (noting statutes in 1993); N. Miller, Institute for Law and Justice, A Law Enforcement and Prosecution Perspective 7, and n. 74,8, and n. 90 (2003), http://www.ilj.org/dv/dvvawa2000.htm (as visited June 24,2005, and available in Clerk of Court’s case file) (listing Colorado among the many States that currently have mandatory arrest statutes).[9]
Given the specific purpose of these statutes, there can be no doubt that the Colorado Legislature used the term “shall” advisedly in its domestic restraining order statute. While *782 “shall” is probably best read to mean “may” in other Colorado statutes that seemingly mandate enforcement, cf. Colo. Rev. Stat. § 31-4-112 (Lexis 2004) (police “shall suppress all riots, disturbances, and breaches of the peace, shall apprehend all disorderly persons in the city ...” (emphasis added)), it is clear that the elimination of police discretion was integral to Colorado and its fellow States’ solution to the problem of underenforcement in domestic violence cases.[10] Since the text of Colorado’s statute perfectly captures this legislative purpose, it is hard to imagine what the Court has in mind when it insists on “some stronger indication from the Colorado Legislature.” Ante, at 761.
While Colorado case law does not speak to the question, it is instructive that other state courts interpreting their analogous statutes have not only held that they eliminate the police’s traditional discretion to refuse enforcement, but have *783 also recognized that they create rights enforceable against the police under state law. For example, in Nearing v. Weaver, 295 Ore. 702, 670 P. 2d 137 (1983) (en banc), the court held that although the common law of negligence did not support a suit against the police for failing to enforce a domestic restraining order, the statute’s mandatory directive formed the basis for the suit because it was “a specific duty imposed by statute for the benefit of individuals previously identified by judicial order.” Id., at 707, 670 P. 2d, at 140.[11] In Matthews v. Pickett County, 996 S. W. 2d 162 (Tenn. 1999) (on certification to the Sixth Circuit), the court confirmed that the statute mandated arrest for violations of domestic restraining orders, and it held that the “public duty” defense to a negligence action was unavailable to the defendant police officers because the restraining order had created a “special duty” to protect the plaintiff. Id., at 165. See also Campbell v. Campbell, 294 N. J. Super. 18, 24, 682 A. 2d 272, 274 (1996) (domestic restraining order statute “allows no discretion” with regard to arrest; “[t]he duty imposed on the police officer is ministerial”); Donaldson v. Seattle, 65 Wash. App. 661, 670, 831 P. 2d 1098, 1103 (1992) (“Generally, where an officer has legal grounds to make an arrest he has considerable discretion to do so. In regard to domestic violence, the rule is the reverse. If the officer has the legal grounds to arrest pursuant to the statute, he has a mandatory duty to make the arrest”). To what extent the Colorado Supreme Court would agree with the views of these courts is, of course, an open question, but it does seem rather brazen for the majority to assume that the Colorado Supreme Court *784 would repudiate this consistent line of persuasive authority from other States.
Indeed, the Court fails to come to terms with the wave of domestic violence statutes that provides the crucial context for understanding Colorado’s law. The Court concedes that, “in the specific context of domestic violence, mandatory-arrest Statutes have been found in some States to be more mandatory than traditional mandatory-arrest statutes,” ante, at 762, but that is a serious understatement. The difference is not a matter of degree, but of kind. Before this wave of statutes, the legal rule was one of discretion; as the Court shows, the “traditional,” general mandatory arrest statutes have always been understood to be “mandatory” in name only, see ante, at 760. The innovation of the domestic violence statutes was to make police enforcement, not “more mandatory,” but simply mandatory. If, as the Court says, the existence of a protected “entitlement” turns on whether “government officials may grant or deny it in their discretion,” ante, at 756, the new mandatory statutes undeniably create an entitlement to police enforcement of restraining orders.
Perhaps recognizing this point, the Court glosses over the dispositive question — whether the police enjoyed discretion to deny enforcement — and focuses on a different question— which “precise means of enforcement,” ante, at 763, were called for in this case. But that question is a red herring. The statute directs that, upon probable cause of a violation, “a peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person.” Colo. Rev. Stat. § 18-6-803.5(3)(b) (Lexis 1999). Regardless of whether the enforcement called for in this case was arrest or the seeking of an arrest warrant (the answer to that question probably changed over the course of the night as the respondent gave the police more information about the husband’s whereabouts), the crucial point is that, under the statute, the police were required to provide enforcement; they lacked the discretion to do noth *785 ing.[12] The Court suggests that the fact that “enforcement” may encompass different acts infects any entitlement to enforcement with “indeterminacy.” Ante, at 763. But this objection is also unfounded. Our cases have never required the object of an entitlement to be some mechanistic, unitary thing. Suppose a State entitled every citizen whose income was under a certain level to receive health care at a state clinic. The provision of health care is not a unitary thing— doctors and administrators must decide what tests are called for and what procedures are required, and these decisions often involve difficult applications of judgment. But it could not credibly be said that a citizen lacks an entitlement to health care simply because the content of that entitlement is not the same in every given situation. Similarly, the enforcement of a restraining order is not some amorphous, indeterminate thing. Under the statute, if the police have probable cause that a violation has occurred, enforcement consists of either making an immediate arrest or seeking a warrant and then executing an arrest — traditional, well-defined tasks that law enforcement officers perform every day.[13]
*786 The Court similarly errs in speculating that the Colorado Legislature may have mandated police enforcement of restraining orders for “various legitimate ends other than the conferral of a benefit on a specific class of people,” ante, at 765; see also ibid, (noting that the “serving of public rather than private ends is the normal course of the criminal law”). While the Court’s concern would have some bite were we *787 faced with a broadly drawn statute directing, for example, that the police “shall suppress all riots,” there is little doubt that the statute at issue in this case conferred a benefit “on a specific class of people” — namely, recipients of domestic restraining orders. Here, respondent applied for and was granted a restraining order from a Colorado trial judge, who found a risk of “irreparable injury” and found that “physical or emotional harm” would result if the husband were not excluded from the family home. 366 F. 3d, at 1143 (appendix to dissent of O’Brien, J.). As noted earlier, the restraining order required that the husband not “molest or disturb” the peace of respondent and the daughters, and it ordered (with limited exceptions) that the husband stay at least 100 yards away from the family home. Ibid,.[14] It also directed the police to “use every reasonable means to enforce this . . . order,” and to arrest or seek a warrant upon probable cause of a violation. Id., at 1144. Under the terms of the statute, when the order issued, respondent and her daughters became “ ‘protected person[s].’ ” § 18-6-803.5(1.5)(a) (“ ‘Protected person’ means the person or persons identified in the restraining order as the person or persons for whose benefit the restraining order was issued”).[15] The statute criminalized the knowing violation of the restraining order, §18-6-803.5(1), and, as already discussed, the statute (as *788 well as the order itself) mandated police enforcement, §§ 18-6-803.5(3)(aMb).[16]
Because the statute's guarantee of police enforcement is triggered by, and operates only in reference to, a judge’s granting of a restraining order in favor of an identified “ ‘protected person,’ ” there is simply no room to suggest that such a person has received merely an “ ‘incidental’ ” or “ ‘indirect’ ” benefit, see ante, at 766-767. As one state court put it, domestic restraining order statutes “identify with precision when, to whom, and under what circumstances police protection must be afforded. The legislative purpose in requiring the police to enforce individual restraining orders clearly is to protect the named persons for whose protection the order is issued, not to protect the community at large by general law enforcement activity.” Nearing, 295 Ore., at 712, 670 P. 2d, at 143.[17] Not only does the Court’s doubt about *789 whether Colorado’s statute created an entitlement in a protected person fail to take seriously the purpose and nature of restraining orders, but it fails to account for the decisions by other state courts, see supra, at 782-783, that recognize that such statutes and restraining orders create individual rights to police action.
IV
Given that Colorado law has quite clearly eliminated the police’s discretion to deny enforcement, respondent is correct that she had much more than a “unilateral expectation” that the restraining order would be enforced; rather, she had a “legitimate claim of entitlement” to enforcement. Roth, 408 U. S., at 577. Recognizing respondent’s property interest in the enforcement of her restraining order is fully consistent with our precedent. This Court has “made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money.” Id., at 571-572. The “types of interests protected as ‘property’ are varied and, as often as not, intangible, relating ‘to the whole domain of social and economic fact.’” Logan v. Zimmerman Brush Co., 455 U. S. 422, 430 (1982); see also Perry v. Sindermann, 408 U. S. 593, 601 (1972) (“ ‘[Property’ interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, ‘property’ denotes a broad range of interests that are secured by ‘existing rules or understandings’ ”). Thus, our cases have found “property” interests in a number of state-conferred benefits and services, including welfare benefits, Goldberg v. Kelly, 397 U. S. 254 (1970); disability benefits, Mathews v. Eldridge, 424 U. S. 319 (1976); public education, Goss v. Lopez, 419 U. S. 565 (1975); utility services, Memphis Light, Gas & Water Div. v. Craft, 436 U. S. 1 (1978); government employment, Cleveland Bd. of Ed. v. *790 Loudermill, 470 U. S. 532 (1985), as well as in other entitlements that defy easy categorization, see, e. g., Bell v. Burson, 402 U. S. 535 (1971) (due process requires fair procedures before a driver’s license may be revoked pending the adjudication of an accident claim); Logan, 455 U. S., at 431 (due process prohibits the arbitrary denial of a person’s interest in adjudicating a claim before a state commission).
Police enforcement of a restraining order is a government service that is no less concrete and no less valuable than other government services, such as education.[18] The relative novelty of recognizing this type of property interest is explained by the relative novelty of the domestic violence statutes creating a mandatory arrest duty; before this innovation, the unfettered discretion that characterized police enforcement defeated any citizen’s “legitimate claim of entitlement” to this service. Novel or not, respondent’s claim finds strong support in the principles that underlie our due process jurisprudence. In this case, Colorado law guaranteed the provision of a certain service, in certain defined circumstances, to a certain class of beneficiaries, and respondent reasonably relied on that guarantee. As we observed in Roth, “[i]t is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.” *791 408 U. S., at 577. Surely, if respondent had contracted with a private security firm to provide her and her daughters with protection from her husband, it would be apparent that she possessed a property interest in such a contract. Here, Colorado undertook a comparable obligation, and respondent — with restraining order in hand — justifiably relied on that undertaking. Respondent’s claim of entitlement to this promised service is no less legitimate than the other claims our cases have upheld, and no less concrete than a hypothetical agreement with a private firm.[19] The fact that it is based on a statutory enactment and a judicial order entered for her special protection, rather than on a formal contract, does not provide a principled basis for refusing to consider it “property” worthy of constitutional protection.[20]
*792 V
Because respondent had a property interest in the enforcement of the restraining order, state officials could not deprive her of that interest without observing fair procedures.[21] Her description of the police behavior in this case and the department’s callous policy of failing to respond properly to reports of restraining order violations clearly al *793 leges a due process violation. At the very least, due process requires that the relevant state decisionmaker listen to the claimant and then apply the relevant criteria in reaching his decision.[22] The failure to observe these minimal procedural safeguards creates an unacceptable risk of arbitrary and “erroneous deprivation^],” Mathews, 424 U. S., at 335. According to respondent’s complaint — which we must construe liberally at this early stage in the litigation, see Swierkiewicz v. Sorema N. A., 534 U. S. 506, 514 (2002) — the process she was afforded by the police constituted nothing more than a “ ‘sham or a pretense.’ ” Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U. S. 123, 164 (1951) (Frankfurter, J., concurring).
Accordingly, I respectfully dissent.

 The Court of Appeals also looked to other provisions of the statute to inform its analysis. In particular, it reasoned that a provision that gave police officers qualified immunity in connection with their enforcement of *776 restraining orders, see Colo. Rev. Stat. §18-6-803.5(5) (Lexis 1999), supported the inference that the Colorado Legislature intended mandatory enforcement. See 366 F. 3d 1093, 1108 (CA10 2004) (en banc).

 The Court declines to show deference for the odd reason that, in its view, the Court of Appeals did not “draw upon a deep well of state-specific expertise,” ante, at 757, but rather examined the statute’s text and legislative history and distinguished arguably relevant Colorado case law. See ante, at 757, and n. 4. This rationale makes a mockery of our traditional practice, for it is precisely when there is no state law on point that the presumption that circuits have local expertise plays any useful role. When a circuit’s resolution of a novel question of state law is grounded on a concededly complete review of all the pertinent state-law materials, that decision is entitled to deference. Additionally, it should be noted that this is not a case in which the Court of Appeals and the District Court disagreed on the relevant issue of state law; rather, those courts disagreed only over the extent to which a probable-cause determination requires the exercise of discretion. Compare 366 F. 3d, at 1105-1110, with App. to Pet. for Cert. 122a (District Court opinion).

 See Colo. Rule App. Proc. 21.1(a) (Colorado Supreme Court may answer questions of law certified to it by the Supreme Court of the United States or another federal court if those questions “may be determinative of the cause” and “as to which it appears to the certifying court there is no controlling precedent in the decisions of the [Colorado] Supreme Court”).

 See Westminster v. Dogan Constr. Co., 930 P. 2d 585, 590 (Colo. 1997) (en banc) (in interpreting an ambiguous statute, the Colorado Supreme Court will consider legislative history and the “consequences of a particular construction”); ibid. (“ ‘Because we also presume that legislation is intended to have just and reasonable effects, we must construe statutes accordingly and apply them so as to ensure such results’ ”). Additionally, it is possible that the Colorado Supreme Court would have better access to (and greater facility with) relevant pieces of legislative history beyond those that we have before us. That court may also choose to give certain evidence of legislative intent greater weight than would be customary for this Court. See, e. g., Brief for Peggy Kerns et al. as Amici Curiae (bill sponsor explaining the Colorado General Assembly’s intent in passing the domestic restraining order statute).

 Citing similar considerations, the Second Circuit certified questions of state law to the Connecticut Supreme Court when it was faced with a procedural due process claim involving a statute that arguably mandated the removal of children upon probable cause of child abuse. See Sealed v. Sealed, 332 F. 3d 51 (2003). The Connecticut Supreme Court accepted *778 certification and held that the provision was discretionary, not mandatory. See Teresa T. v. Ragaglia, 272 Conn. 734, 865 A. 2d 428 (2005).

 The Court is correct that I would take an “anyone-but-us approach,” ante, at 758, n. 5, to the question of who decides the issue of Colorado. law in this case. Both options that I favor — deferring to the Circuit’s interpretation or, barring that, certifying to the Colorado Supreme Court — recognize the comparative expertise of another tribunal on questions of state law. And both options offer their own efficiencies. By contrast, the Court’s somewhat overconfident “only us” approach lacks any cogent justification. The fact that neither party requested certification certainly cannot be a sufficient reason for dismissing that option. As with abstention, the considerations that weigh in favor of certification— federal-state comity, constitutional avoidance, judicial efficiency, the desire to settle correctly a recurring issue of state law — transcend the interests of individual litigants, rendering it imprudent to cast them as gatekeepers to the procedure. See, e. g., Elkins v. Moreno, 435 U. S. 647, 662 (1978) (certifying state-law issue absent a request from the parties); Aldrich *779 v. Aldrich, 375 U. S. 249 (1963) (per curiam) (same); see also 17A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §4248, p. 176 (2d ed. 1988) (“Ordinarily a court will order certification on its own motion”).

 See Fuller & Stansberry, 1994 Legislature Strengthens Domestic Violence Protective Orders, 23 Colo. Lawyer 2327 (1994) (“The 1994 Colorado legislative session produced several significant domestic abuse bills that strengthened both civil and criminal restraining order laws and procedures for victims of domestic violence”); id., at 2329 (“Although many law enforcement jurisdictions already take a proactive approach to domestic violence, arrest and procedural policies vary greatly from one jurisdiction to another. H. B. 94-1253 mandates the arrest of domestic violence perpetrators and restraining order violaters. H. B. 94-1090 repeals the requirement that protected parties show a copy of their restraining order to enforcing officers. In the past, failure to provide a copy of the restraining order has led to hesitation from police to enforce the order for fear of an illegal arrest. The new statute also shields arresting officers from liability; this is expected to reduce concerns about enforcing the mandatory arrest requirements” (footnotes omitted)).

 See Sack 1669 (“The movement to strengthen arrest policies was bolstered in 1984 by the publication of the results of a study on mandatory arrest in domestic violence cases that had been conducted in Minneapolis. In this study, police handled randomly assigned domestic violence offenders by using one of three different responses: arresting the offender, mediating the dispute or requiring the offender to leave the house for eight hours. The study concluded that in comparison with the other two re *781 sponses, arrest had a significantly greater impact on reducing domestic violence recidivism. The findings from the Minneapolis study were used by the U. S. Attorney General in a report issued in 1984 that recommended, among other things, arrest in domestic violence cases as the standard law enforcement response” (footnotes omitted)); see also Zorza, The Criminal Law of Misdemeanor Domestic Violence, 1970-1990, 83 J. Crim. L. & C. 46, 63-65 (1992) (tracing history of mandatory arrest laws and noting that the first such law was implemented by Oregon in 1977).

 See also Brief for International Municipal Lawyers Association et al. as Amici Curiae 6 (“Colorado is not alone in mandating the arrest of persons who violate protective orders. Some 19 states require an arrest when a police officer has probable cause to believe that such orders have been violated” (collecting statutes)).

 See Note, Mandatory Arrest: A Step Toward Eradicating Domestic Violence, But is It Enough? 1996 U. Ill. L. Rev. 533, 541-542, 544-546 (describing the problems that attend a discretionary arrest regime: “Even when probable cause is present, police officers still frequently try to calm the parties and act as mediators.. .. Three studies found the arrest rate to range between 3% and 10% when the decision to arrest is left to police discretion. Another study found that the police made arrests in only 13% of the cases where the victim had visible injuries.... Police officers often employ irrelevant criteria such as the ‘reason’ for the abuse or the severity of the victim’s injuries in making their decision to arrest.. . . Some [officers] may feel strongly that police should not interfere in family arguments or lovers’ quarrels. Such attitudes make police much more likely to investigate intent and provocation, and consider them as mitigating factors, in responding to domestic violence calls than in other types of cases” (footnotes omitted)); see also Walsh, The Mandatory Arrest Law: Police Reaction, 16 Pace L. Rev. 97, 98 (1995). C£ Sack 1671-1672 (“Mandatory arrest policies have significantly increased the number of arrests of batterers for domestic violence crimes. ... In New York City, from 1993, the time the mandatory arrest policy was-instituted, to 1999, felony domestic violence arrests increased 33%, misdemeanor domestic violence arrests rose 114%, and arrests for violation of orders of protection were up 76%”).

 The Oregon Supreme Court noted that the “widespread refusal or failure of police officers to remove persons involved in episodes of domestic violence was presented to the legislature as the main reason for tightening the law so as to require enforcement of restraining orders by mandatory arrest and custody.” Nearing, 295 Ore., at 709, 670 P. 2d, at 142.

 Under the Court’s reading of the statute, a police officer with probable cause is mandated to seek an arrest warrant if arrest is “impractical under the circumstances,” but then enjoys unfettered discretion in deciding whether to execute that warrant. Ante, at 764. This is an unlikely reading given that the statute was motivated by a profound distrust of police discretion in the domestic violence context and motivated by a desire to improve the protection given to holders of domestic restraining orders. We do not have the benefit of an authoritative construction of Colorado law, but I would think that if an estranged husband harassed his wife in violation of a restraining order, and then absconded after she called the police, the statute would not only obligate the police to seek an arrest warrant, but also obligate them to execute it by making an arrest. In any event,' under respondent’s allegations, by the time the police were informed of the husband’s whereabouts, an arrest was practical and, under the statute’s terms, mandatory.

 The Court wonders “how the mandatory-arrest paradigm applies to cases in which the offender is not present to be arrested.” Ante, at 762. Again, questions as to the scope of the obligation to provide enforcement *786 are far afield from the key issue — whether there exists an entitlement to enforcement. In any event, the Court’s speculations are off base. First, this is not a case like Donaldson v. Seattle, 65 Wash. App. 661, 831 P. 2d 1098 (1992), in which the restrained person violated the order and then left the scene. Here, not only did the husband violate the restraining order by coming within 100 yards of the family home, but he continued to violate the order while his abduction of the daughters persisted. This is because the restraining order prohibited him from “molest[ing) or disturb[ing] the peace” of the daughters. See 366 F. 3d, at 1143 (appendix to dissent of O’Brien, J.). Because the “scene” of the violation was wherever the husband was currently holding the daughters, this case does not implicate the question of an officer’s duties to arrest a person who has left the scene and is no longer in violation of the restraining order. Second, to the extent that arresting the husband was initially “impractical under the circumstances” because his whereabouts were unknown, the Colorado statute (unlike some other States’ statutes) expressly addressed that situation — it required the police to seek an arrest warrant. Third, the Court is wrong to suggest that this case falls outside the core situation that these types of statutes were meant to address. One of the well-known cases that contributed to the passage of these statutes involved facts similar to this case. See Sorichetti v. New York City, 65 N. Y. 2d 461, 467, 482 N. E. 2d 70, 74 (1985) (police officers at police station essentially ignored a mother’s pleas for enforcement of a restraining order against an estranged husband who made threats about their 6-year-old daughter; hours later, as the mother persisted in her pleas, the daughter was found mutilated, her father having attacked her with a fork and a knife and attempted to saw off her leg); Note, 1996 U. Ill. L. Rev., at 539 (noting Sorichetti in the development of mandatory arrest statutes); see also Sack 1663 (citing the police’s failure to respond to domestic violence calls as an impetus behind mandatory arrest statutes). It would be singularly odd to suppose that in passing its sweeping omnibus domestic violence legislation, the Colorado Legislature did not mean to require enforcement in the case of an abduction of children in violation of a restraining order.

 The order also stated: “If you violate this order thinking that the other party or child named in this order has given you permission, you are wrong, and can be arrested and prosecuted. The terms of this order cannot be changed by agreement of the other party or the children). Only the court can change this order.” 366 F. 3d, at 1144 (appendix to dissent of O’Brien, J.).

 A concern for the “ ‘protected person’ ” pervades the statute. For example, the statute provides that a “peace officer may transport, or obtain transportation for, the alleged victim to shelter. Upon the request of the protected person, the peace officer may also transport the minor child of the protected person, who is not an emancipated minor, to the same shelter ....” § 18-6-803.5(6)(a).

 I find it neither surprising nor telling, cf. ante, at 766, that the statute requires the restraining order to contain, “in capital letters and bold print,” a “notice” informing protected persons that they can demand or request, respectively, civil and criminal contempt proceedings. § 18-6-803.5(7). While the legislature may have thought that these legal remedies were not popularly understood, a person’s right to “demand” or “request” police enforcement of a restraining order simply goes without saying given the nature of the order and its language. Indeed, for a holder of a restraining order who has read the order’s emphatic language, it would likely come as quite a shock to learn that she has no right to demand enforcement in the event of a violation. To suggest that a protected person has no such right would posit a lacuna between a protected person’s rights and an officer’s duties — a result that would be hard to reconcile with the Colorado Legislature’s dual goals of putting an end to police indifference and empowering potential victims of domestic abuse.

 See also Matthews v. Pickett County, 996 S. W. 2d 162, 165 (Tenn. 1999) (“The order of protection in this case was not issued for the public’s protection in general. The order of protection specifically identified Ms. Matthews and was issued solely for the purpose of protecting her. Cf. Ezell [v. Cockrell, 902 S. W. 2d 394, 403 (Tenn. 1995)] (statute prohibiting drunk driving does not specify an individual but undertakes to protect' the public in general from intoxicated drivers)”); Sorichetti, 65 N. Y. 2d, at 469, 482 N. E. 2d, at 75 (“The [protective] order evinces a preincident *789 legislative and judicial determination that its holder should be accorded a reasonable degree of protection from a particular individual”).

 The Court mistakenly relies on O’Bannon v. Town Court Nursing Center, 447 U. S. 773 (1980), in explaining why it is “by no means clear that an individual entitlement to enforcement of a restraining order could constitute a ‘property’ interest for purposes of the Due Process Clause.” Ante, at 766. In O’Bannon, the question was essentially whether certain regulations provided nursing-home residents with an entitlement to continued residence in the home of their choice. 447 U. S., at 785. The Court concluded that the regulations created no such entitlement, but there was no suggestion that Congress could not create one if it wanted to. In other words, O’Bannon did .not address a situation in which the underlying law created an entitlement, but the Court nevertheless refused to treat that entitlement as a property interest within the meaning of the Due Process Clause.

 As the analogy to a private security contract demonstrates, a person’s interest in police enforcement has “‘some ascertainable monetary value,”’ ante, at 766. Cf. Merrill, The Landscape of Constitutional Property, 86 Va. L. Rev. 885, 964, n. 289 (2000) (remarking, with regard to the property interest recognized in Goss v. Lopez, 419 U. S. 565 (1975), that “any parent who has contemplated sending their children to private schools knows that public schooling has a monetary value”). And while the analogy to a private security contract need not be precise to be useful, I would point out that the Court is likely incorrect in stating that private security guards could not have arrested the husband under the circumstances, see ante, at 766-767, n. 12. Because the husband’s ongoing abduction of the daughters would constitute a knowing violation of the restraining order, see n. 13, supra, and therefore a crime under the statute, see § 18-6-803.5(1), a private person who was at the scene and aware of the circumstances of the abduction would have authority to arrest. See § 16-3-201 (“A person who is not a peace officer may arrest another person when any crime has been or is being committed by the arrested person in the presence of the person making the arrest”). Our cases, of course, have never recognized any requirement that a property interest possess “‘some ascertainable monetary value.’” Regardless, I would assume that respondent would have paid the police to arrest her husband if that had been possible; at the very least, the entitlement has a monetary value in that sense.

 According to Justice Souter, respondent has asserted a property interest in merely a “state-mandated process,” ante, at 771 (concurring opinion), rather than in a state-mandated “substantive guarantee,” *792 ibid. This misunderstands respondent’s claim. Putting aside the inartful passage of respondent’s brief that Justice Souter relies upon, ante, at 770, it is clear that respondent is in fact asserting a substantive interest in the “enforcement of the restraining order,” Brief for Respondent 10. Enforcement of a restraining order is a tangible, substantive act. If an estranged husband violates a restraining order by abducting children, and the police succeed in enforcing the order, the person holding the restraining order has undeniably just received a substantive benefit. As in other procedural due process cases, respondent is arguing that the police officers failed to follow fair procedures in ascertaining whether the statutory criteria that trigger their obligation to provide enforcement — i. e., an outstanding order plus probable cause that it is being violated — were satisfied in her ease. Cf. Carey v. Piphus, 435 U. S. 247, 266-267 (1978) (discussing analytic difference between the denial of fair process and the denial of the substantive benefit itself). It is Justice Souter, not respondent, who makes the mistake of “collapsing the distinction between property protected and the process that protects it,” ante, at 772.
Justice Souter also errs in suggesting that respondent cannot have a property interest in enforcement because she would not be authorized to instruct the police to refrain from enforcement in the event of a violation. Ante, at 770. The right to insist on the provision of a service is separate from the right to refuse the service. For example, compulsory attendance laws deny minors the right to refuse to attend school. Nevertheless, we have recognized that minors have a property interest in public education and that school officials must therefore follow fair procedures when they seek to deprive minors of this valuable benefit through suspension. See Goss, 419 U. S. 565. In the end, Justice Souter overlooks the core purpose of procedural due process — ensuring that a citizen’s reasonable reliance is not frustrated by arbitrary government action.

 See Logan v. Zimmerman Brush Co., 455 U. S. 422, 432 (1982) (“ ‘ “While the legislature may elect not to confer a property interest,. .. it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards” ’ ”).

 See Fuentes v. Shevin, 407 U. S. 67, 81 (1972) (“[W]hen a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented” (emphasis added)); Bell v. Burson, 402 U. S. 535, 542 (1971) (“It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision whether licenses of the nature here involved shall be suspended does not meet [the] standard [of due process]”); Goldberg v. Kelly, 397 U. S. 254, 271 (1970) (“[T]he decisionmaker’s conclusion as to a recipient’s eligibility must rest solely on the legal rules and evidence adduced at the hearing”); cf. ibid. (“[0]f course, an impartial decision maker is essential”).